## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SUSAN J. SEYBERT,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE INTERNATIONAL GROUP, INC.,** | : | |
| **Defendant.** | : | **NO. 07-3333** |

### MEMORANDUM AND ORDER

GENE E.K. PRATTER, J.                                            MARCH 17, 2009

Sexual harassment and retaliation claims are not uncommon in today's workplace, leaving the courts to sort out conduct that is legally actionable from conduct that is not. The statutory scheme designed by Congress and the caselaw developed by the appellate courts do not include all reprehensible, unfair, or improper conduct in the workplace among the permitted causes of action. On the other hand, some conduct that may seem basically innocent or merely humorous to some people or not intended to insult or injure, has led to significant damage recoveries. Some workplace interactions present "textbook" demonstrations of why the law is available for the redress of employment-related injuries. This case presents some features of all of the above.

Ms. Susan Seybert has sued her employer, The International Group, Inc. ("IGI"), claiming sexual harassment based on a hostile work environment, retaliatory harassment, and retaliatory discharge, under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA"). After the close of discovery, IGI filed a Motion for Summary Judgment on all of Ms. Seybert's claims, arguing that Ms. Seybert's treatment was not motivated by gender bias; that Ms. Seybert was not subjected to a hostile work environment; that Ms.

Seybert's complaints did not constitute protected conduct; that the company decision-makers did not know about Ms. Seybert's complaints and, therefore, did not retaliate against her for making them; and that Ms. Seybert's claims under the PHRA are untimely. Ms. Seybert opposes the Motion.

For the reasons that follow, the Court must deny summary judgment to IGI.

I.      STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. at 56(c). Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it could affect the result of the suit under governing law. Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. Celotex, 477 U.S. at 322-23. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

II.   FACTUAL HISTORY[1]

A.   Ms. Seybert's Work at IGI Before the Alleged Harassment and Retaliation

Ms. Seybert started working for IGI in November 2000. (Ex. A, Deposition of Susan Seybert, at 31, 33.)[2]   Initially, her job title was customer service manager in the Wayne, Pennsylvania office. (Ex. A, at 33-34.) At the beginning of her employment, she reported directly to the President and one-half owner of IGI, Ken Reucassel. (Id.; Ex. B, Deposition of Ken Reucassel, at 8.)[3]   During this time, Ken Reucassel was located primarily in Toronto, an arrangement that continued until January 2003. (Id.)

---

[1] The factual history is undisputed except as expressly noted. Where there is a factual dispute, as long as Ms. Seybert has record support for her position, the facts are viewed in the light most favorable to her.

[2] Letter exhibits refer to IGI's exhibits, while number exhibits refer to Ms. Seybert's exhibits.

[3] Ken Reucassel is the President and the owner of one half of IGI; Ross Reucassel is Ken Reucassel's father and owner of the other half of IGI. (Ex. B at 7.) For the sake of clarity, the Court will refer to these gentlemen using both their first and last names.

Ms. Seybert and Ken Reucassel had a very good working relationship, maintaining strong contact to achieve the job goals set for her. (Id.) Ms. Seybert consistently met Ken Reucassel's professional expectations, and Ken Reucassel was satisfied with her performance. (Ex. A, at 36-37; Ex. B, at 19.) In February 2003, Ms. Seybert was promoted to Corporate Manager, Global Customer Support. (Ex. A, at 33-34.) In her new role, Ms. Seybert had responsibility for the company's entire Customer Service function throughout the United States and Canada. (Ex. A, at 39; Ex 2, at EEOC 000238.)

At or about the time of Ms. Seybert's promotion, she began reporting directly to Brett Marchand. (Ex. A, at 39-41.) Mr. Marchand also supervised Shirley Meihlke, Katherine Vance, and Jesse Agnostopolous. (Ex. A, at 47, 48.) Mr. Marchand visited the Wayne operations approximately once per month for two days, and Ms. Seybert visited the Toronto office approximately twice per month for three days. (Ex. A, at 51-52.)

B.     Alleged Initial Harassment by Mr. Marchand

1.     Initial Deterioration of Mr. Marchand and Ms. Seybert's Relationship

Before Mr. Marchand became Ms. Seybert's manager, Ms. Seybert and Mr. Marchand were peers, and Ms. Seybert believed they had a good working relationship. (Ex. A, at 40-41.) However, once Mr. Marchand became Ms. Seybert's manager, their relationship deteriorated quickly. (Id. at 41-42.) Early on in this arrangement, Mr.Marchand and Ms. Seybert visited a tank farm in Baltimore, and Mr. Marchand asked Ms. Seybert to drive back to Wayne with him. (Id. at 42.) During that ride, Mr. Marchand peppered Ms. Seybert with questions about another co-worker's performance as a manager, which made Ms. Seybert very uncomfortable, and she told him so. (Id. at 42, 49.)

2.      Mr. Marchand's Reaction to Ms. Seybert's Call to Human Resources

Mr. Marchand visited the Wayne office on multiple occasions prior to March 2003, and

each time he took a different customer service representative to lunch.  (Ex. A, at 65.)[4]  At these

lunches, Mr. Marchand made comments about the customer service representatives'

performances that Ms. Seybert felt lowered morale in the office.  (Ex. A, at 65-66.)

When he visited the Wayne office, Mr. Marchand often commented to the staff that the

office would be closing.  (Ex. A, at 66-67.)  Upon learning of these comments, Ms. Seybert

called Heather Meikle, IGI's Human Resources Director, for advice on how to handle the

situation.  (Ex. A, at 66-67; Ex. B at 8.)  Within five minutes of that phone conversation, Mr.

Marchand called Ms. Seybert and began screaming at her for calling Human Resources about his

conduct.  (Ex. A, at 68.)  He told her that if she did not get her "staff up to speed and together,"

she would be "walking the streets."  (Id.)  Ms. Seybert perceived this comment as a threat to her

job.  (Id.)[5]  Mr. Marchand ended the call by hanging up on her.  (Ex. A, at 71.)

3.      Ms. Seybert Asks Mr. Marchand Why He is Staring at her Breasts

In March 2003, during a business conversation in Ms. Seybert's office, Ms. Seybert

noticed Mr. Marchand staring at her breasts, which made her feel embarrassed and self-

conscious.  (Ex. A, at 50, 53-54.)  Taken aback, Ms. Seybert put her arms up in front of her and

looked down to see if her shirt was unbuttoned.  (Id.)  She asked Mr. Marchand whether her shirt

---

[4] Ms. Seybert notes that the dates are only approximations and identified in relative terms
to other events.

[5] In her testimony, Ms. Seybert paraphrased Mr. Marchand's comments to her; she stated
that she could not remember his exact words.  (Ex. A, at 68.)

was unbuttoned, if something was wrong, and why he was staring at her breasts. (Ex. A, at 50, 53-54, 62.) Mr. Marchand said he did not know what Ms. Seybert was talking about. (Id.)

Approximately one month later, during a business trip to Toronto, Ms. Seybert met with Mr. Marchand in his office. (Ex. A, at 52.) Again, Mr. Marchand stared at Ms. Seybert's breasts. (Id.) Again, Ms. Seybert felt self conscious, so she ended her conversation with Mr. Marchand and left his office as soon as she could. (Id. at 53.)

C.    Ms. Seybert's Complaint to Ken Reucassel in Spring 2003

Soon after incident in the Toronto office, Ms. Seybert complained to Ken Reucassel about Mr. Marchand's behavior. (Ex. A, at 69, 80.) During that discussion, Ms. Seybert expressed her concerns regarding Mr. Marchand's earlier "walking the streets" comment, and the two incidents when Mr. Marchand had stared at her breasts. (Id.) Ms. Seybert specifically told Ken Reucassel that she was not comfortable working for Mr. Marchand, and suggested alternative working relationships. (Id.) Ken Reucassel told Ms. Seybert that she and Mr. Marchand had to learn to work together. (Ex. 3, at 3; Ex. A, at 69, 80.) During the same discussion, Ken Reucassel said that he would "talk to" Mr. Marchand about what Ms. Seybert had told him. (Ex. 3, at 3.) Ken Reucassel never followed up with Ms. Seybert or spoke to her about her complaint again. (Ex. A, at 108.) Mr. Marchand did not stare at Ms. Seybert's breasts again. (Id. at 54.)[6]

_____

[6] These facts are presented in the light most favorable to Ms. Seybert; they are disputed by IGI. Ken Reucassel denies that Ms. Seybert reported Mr. Marchand's conduct of staring at her breasts, although he admits that Ms. Seybert "at one point" expressed "some frustration working with Brett [Marchand], but you know, it was all business related, and my recollection is it more had to do with the change than it did with anything else. I mean, I don't remember it being any significant issues." (Ex. B, at 21-24.) Ken Reucassel denies that Ms. Seybert said she
(continued...)

D.    Mr. Marchand Ignored Ms. Seybert and Was Otherwise Unavailable

Shortly after Ms. Seybert spoke with Ken Reucassel about Mr. Marchand, Mr. Marchand began ignoring Ms. Seybert, and continued to do so for several months.  For example, Mr. Marchand used email or voicemail to communicate with Ms. Seybert instead of taking her telephone calls as he had previously.  (Ex. 3, at 5; Ex. A, at 218.)  Mr. Marchand also tended to travel to the Wayne office when Ms. Seybert was in Toronto.  (Id.)

E.    Mr. Marchand Berates Ms. Seybert at Lunch and Demands Respect

This period of limited contact between Mr. Marchand and Ms. Seybert ended when Mr. Marchand traveled to the Wayne office in the summer of 2003 and informed Ms. Seybert that he wanted to meet with her to discuss business matters.  (Ex. 3, at 5.)  Ms. Seybert suggested that they order lunch in, or meet after lunch; however, Mr. Marchand insisted that they go out to lunch, and that they "go now."  (Id.)  Mr. Marchand also insisted that they drive to the restaurant together in his rental car.  (Id.)

Once at the restaurant, Mr. Marchand berated Ms. Seybert and told her what a poor job she was doing.  (Ex. A, at 98, 110-11.)  At some point during the lunch, he yelled at her, (Ex. A, at 110-11), and accused her of not having the same drive or desire that she did when she worked for Ken Reucassel, (Ex. 3, at 5; Ex. A, at 101-03).  Ms. Seybert responded that she did not have the same respect for Mr. Marchand that she had for Ken Reucassel.  Mr. Marchand then demanded respect from Ms. Seybert: "You have no choice but to accept that I am your superior;

_____

(continued...)

was uncomfortable reporting to Mr. Marchand, although he admits that she might have asked to again report to him instead of to Mr. Marchand.  (Ex. B, at 22-23.)

you will do what's asked of you; you will respect me." Ms.Seybert replied that respect is earned, not demanded. (Ex. 3, at 5; Ex. A, at 100-02.)

 F. Mr. Marchand's Reaction to Ms. Seybert's Memo

 At some point in 2003, IGI decided to terminate the employment of Gloria Baumgard, an employee who worked for Ms. Seybert. (Ex. A, at 55.) Ken Reucassel visited Wayne, (Ex. A. at 59), to tell Ms. Baumgard that her employment was scheduled for termination. (Ex. A, at 55.) Later in the year, Ms. Seybert became concerned about the ability of the staff in Wayne to handle the volume of work if Ms. Baumgard left as scheduled. (Id.) By September 2003, Ms. Seybert had made several unsuccessful attempts to obtain Mr. Marchand's approval to extend Ms. Baumgard's termination date. (Id.) Ms. Seybert wrote a memorandum to Mr. Marchand on September 26, 2003, (Ex. A, at 58; Ex. F), in which she outlined her reasons for wanting to keep Ms. Baumgard. (Ex. A, at 55, 56; Ex. 2, EEOC 000106.)

 Ms. Meikle, the Human Resources Manager, testified that she did not see anything inappropriate about Ms. Seybert's memorandum. (Ex. D, Deposition of Heather Meikle, at 190.) Mr. Marchand, however, thought differently. When he received the memorandum, he called Ms. Seybert and screamed at her over the phone: "How dare [you] try to retain Baumgard. . . never do that to [me] again!" (Ex. A, at 55-56.) He also stated that he had already made the decision regarding Ms. Baumgard's employment, which Ms. Seybert should accept. (Id. at 56.)

 G. The Recognition Dinner Incident

 Just a few days after Mr. Marchand yelled at Ms. Seybert about her Baumgard memorandum, Ms. Seybert attended a Recognition Dinner in Toronto for all of the personnel who had worked on the successful "BP transition" project. (Id. at 114-15.) Alcohol was

consumed,[7] and some of the attendees were joking about the desserts. (Id. at 120-21.) For example, Ms. Meihlke ordered a "Fool," and some of the attendees joked, "pass the damn Fool down here." (Id. at 121.) Mr. Marchand was at the table with Ms. Seybert, along with a number of other employees and senior management. (Id. at 115.) At some point, Mr. Marchand, who was seated several seats away from Ms. Seybert, leaned down in her direction and said, loudly and clearly, "I heard it's really good if you go down deep, into the chocolate, with your berry." Ex. 3, at 6; Ex. A, at 115.)

Ms. Seybert described her reaction to Mr. Marchand's comment as follows: "I was mortified. I dropped my head down. I could feel myself getting red. This was a comment that was made in front of senior management and my peers and I was horrified by it." (Ex. A, at 115-16.) Ms. Seybert's colleague, Ms. Vance, was also uncomfortable with Mr. Marchand's statement. (Ex. 9, Deposition of Katherine Vance, at 46.) Ms. Vance testified that most people laughed at Mr. Marchand's comment, including herself, but that the laughter was out of discomfort and the comment "pretty much stopped the conversation." (Ex. 9, at 48.) Shortly thereafter, Ms. Seybert got up to leave the table and did not return to the dinner. (Ex. A, at 116; Ex. 9, at 48-49.)

H.     Ms. Seybert's Complaints Regarding the Recognition Dinner

1.     Ms. Seybert's Oral Complaint to Ross Reucassel

After Ms. Seybert returned from Toronto, she met with Ross Reucassel. (Ex. B, at 7.) Ms. Seybert told Ross Reucassel about Mr. Marchand's comment at the Recognition Dinner and

---

[7] This is not to suggest that any of the attendees were under undue influence of alcohol, which would be a description not supported by Ms. Seybert's testimony. (Ex. A, at 125-26.)

how horrified she was by it.  (Ex. A, at 128-29.)  Ms. Seybert also reported to Ross Reucassel

that there had been two prior incidents in which Mr. Marchand had stared at her breasts.  (Id.)

Ms. Seybert recounts that Ross Reucassel snickered in response to Ms. Seybert's comments.  (Id.

at 129-30.)  Ross Reucassel asked Ms. Seybert whether she had reported the situation to the

Human Resources Manager, and Ms. Seybert replied that she had not because "there's some

distrust there."  (Id. at 129.)  Ross Reucassel also asked whether she had put her complaint in

writing.  When Ms. Seybert replied that she had not done so, Ross Reucassel asked her to put her

complaint in writing.  (Id.)

> ### 2.    Ms. Seybert's Written Complaint to Ross Reucassel

Ms. Seybert put her complaint in a written memorandum to Ross Reucassel dated

October 8, 2003.  (Ex. 7, Deposition of Ross Reucassel, at 35-36.)  Ross Reucassel admits he

received the memorandum on or about that date.  (Id.)  This memorandum described the incident

at the Recognition Dinner, as well as the occasions when Mr. Marchand had stared at Ms.

Seybert's breasts.  (Ex. 2, EEOC 000361.)[8]  As with Ms. Seybert's prior complaint to Ken

---

[8] The memorandum stated, in part,

> ... During dessert that evening, Brett Marchand leaned in and said,
> **"Susan, I heard it's really good if you go down deep, in the**
> **chocolate, with your berry."**  It was an obvious sexual and
> inappropriate remark.  I can tell you that I was mortified by this
> comment.  And beyond embarrassment, I was made to feel
> degraded and verbally harassed in front of both my peers and
> Senior Management....
>
> This was not the first time that I've been in an uncomfortable
> situation with Brett Marchand.  I feel self-conscious when we meet
> as he stares at my breasts while talking to me.  I feel that this, too,
> is inappropriate for a member of senior management....

(continued...)

-10-

Reucassel, IGI neither acknowledged nor responded to Ms. Seybert's October 8, 2003 written complaint.  (Ex. 3, at 4.)

        3.     Ken Reucassel and Ross Reucassel's Knowledge of Ms. Seybert's Complaints

Ms. Seybert denies ever speaking to Ken Reucassel about Mr. Marchand's comment at the Recognition Dinner.  (Ex. A, at 123.)  However, because Ken Reucassel's knowledge of her complaints is relevant to Ms. Seybert's retaliatory discharge claim, the Court sets forth Ken Reucassel's conflicting testimony on this point, as well as the related testimony of other individuals.

Ken Reucassel testified that Ms. Seybert called him directly and said that she was upset about Mr. Marchand's comment at the Recognition Dinner, which she identified to him as "inappropriate."  (Ex. B, at 31-33.)  According to Ken Reucassel, Ms. Seybert told him that she did not want to "make a formal complaint" and that she did not want Mr. Marchand to know that she had complained.  (Ex. B, at 36.)  Ken Reucassel further testified that he spoke to Mr. Marchand generally about the inappropriate nature of the conversation at the Recognition Dinner, and the need to be "very careful with those types of conversations because you never known when you're going to offend someone and cross the line, and it's inappropriate and we shouldn't do it."  (Ex. B, at 41-42.)  Ken Reucassel testified that after speaking with Mr.

_____

(continued...)
      (Ex. 2, at EEOC 000361.)

Marchand, he contacted Ms. Seybert and asked her if she considered the matter closed, or whether she wanted to take it further.  (Ex. B, at 42-43.)

Ross Reucassel testified that he called his son, Ken Reucassel, about Ms. Seybert's complaint after receiving her October 8, 2003 memorandum.  (Ex. 7, at 35-36.)  Ross Reucassel asked Ken if he was already aware of Mr. Marchand's comment, and Ken said he was.  (Id.)  Ross Reucassel also asked Ken whether anything had been done about Mr. Marchand's comment, and Ken responded: "Dad, it's taken care of."  (Id. at 36-37.)  Ken Reucassel also told his father that "he had talked to Brett [Marchand] and to Susan [Seybert] and he may have said for them to get it resolved between themselves."  (Ex. 7, at 36.)  Ross Reucassel testified that this was the one and only time he spoke to his son about Ms. Seybert's complaint in the fall of 2003.  (Ex. 7, at 40.)

Contrary to his father's testimony, Ken Reucassel denies ever having a telephone conversation with Ross Reucassel about Ms. Seybert's complaint, and denies ever telling Ross Reucassel that he told Ms. Seybert and Mr. Marchand to work things out between them.  (Ex. B, at 54.)  Instead, Ken claims that he had two in-person conversations with his father about Ms. Seybert's complaint.  (Id. at 48-50, 94-95.)  The first conversation was one in which Ross, having heard about Ms. Seybert's complaint, asked Ken Reucassel about it; Ken Reucassel said that he was dealing with it and would get back to him.  (Id. at 48-49, 94-95.)  The second time they spoke, Ken Reucassel told his father that "the matter was closed."  (Ex. B, at 49-50, 94.)

There are additional factual disputes regarding the communications between Ross and Ken Reucassel regarding Ms. Seybert's complaints.  Ross Reucassel testified that he informed Ken about the specific comment that Mr. Marchand allegedly made at the Recognition Dinner,

-12-

and that he had read the related section of Ms. Seybert's memorandum to Ken over the phone.
(Ex. 7, at 39.)  In contrast, Ken Reucassel "categorically den[ies]" that he was aware what
specific comment Mr. Marchand allegedly made.  (Ex. B, at 54.)  Similarly, Ross Reucassel
testified that he was "confident" that he had sent Ms. Seybert's October 8, 2003 written
complaint to Ken Reucassel.  (Ex. 7, at 40.)  In contrast, Ken Reucassel testified that he was not
aware of Ms. Seybert's October 8, 2003 written complaint until Ms. Seybert's termination, and
he did not even see the memorandum until the week of his deposition, during a preparation
session with his attorney.  (Ex. B, at 50-51.)  According to Ken Reucassel, if he had seen the
memorandum earlier, he "would have acted on it, without a doubt."  (Ex. B, at 53.)

      4.     Ms. Meikle's Knowledge of Ms. Seybert's Complaints

      The Director of Human Resources at IGI testified that she was aware of some comments
or discussions at the Recognition Dinner, but that she did not believe or understand that Ms.
Seybert had made a complaint of harassment.  (Ex. D, Deposition of Heather Meikle, at 101.)
Ms. Meikle also testified, however, that she heard from Ken Reucassel that Ms. Seybert was
uncomfortable with a comment Mr. Marchand had made at the Recognition Dinner.  (Id. at 101-
02.)  From Ken Reucassel, Ms. Meikle understood that Mr. Marchand's comment had "sexual
overtones," but that the comment was made in the context of a number of other comments with
sexual overtones, of which Ms. Meikle did not know the exact substance.  (Id. at 105.)

      At this time, Ms. Meikle concluded that Ms. Seybert was not making a complaint under
IGI's Respect in the Workplace policy.  (Id. at 109-12.)  Ms. Meikle  came to this conclusion
because she did not think that the comment was serious enough to be considered harassing
behavior, because the comment was made in the context of other sexually oriented comments,

and because Ms. Seybert -- according to Ken Reucassel – did not want her concerns to be

"investigated or to go through a formal process." (Id.)

     5.    Mr. Marchand's Knowledge of Ms. Seybert's Complaints

    Apparently, Mr. Marchand did not testify during discovery in this case. He did, however,

prepare a written statement in response to a demand letter received from Ms. Seybert's counsel.

(Ex. 2, EEOC 000338-42; Ex. D, at 164.) In that statement, Mr. Marchand denies that he was

aware – until after Ms. Seybert's termination – of perhaps having done anything inappropriate at

the Recognition Dinner. Specifically, he stated:

> Although I admit that I may have made some offensive
> remark at the BP dinner, I was amazed to find out that I was the
> only one singled out. As I recall, there was significant off colour
> banter at the arrival of the desert [sic] course and everyone,
> including Mrs. Vance, Mrs. Miehlke, Mr. Kalyta, Mr. Bell, Mrs.
> Seybert and I, engaged in commenting on it's [sic] decadent
> nature.
>
> However, had I been aware of my transgressions and Mrs.
> Seybert's true feelings, I would have expressed my deepest
> apologies on the spot. Unfortunately, for everyone involved, I was
> completely unaware of Mrs. Seybert's reaction to my statement,
> until the arrival of the letter from her lawyer. Just the same, I wish
> to offer Mrs. Seybert my most sincere apologies now.

(Id. at EEOC 000340.)

    Ms. Meikle testified that she did not speak to Mr. Marchand about these issues until after

Ms. Seybert's employment termination, although she understood that Ken Reucassel had done

so. (Ex. D, at 113, 162, 166.) Ms. Vance testified, however, that she overheard a conversation

between Ms. Meikle and Mr. Marchand about the Recognition Dinner prior to Ms. Seybert's

termination. (Ex. 9, at 55.) Specifically, Ms. Vance testified that Ms. Meikle walked into Mr.

Marchand's office (which was located immediately next to Ms. Vance's office) and said

something to the effect of, "I want to ask you some questions about what happened at the dinner." (Id.)  Ms. Vance notified Ms. Seybert that Ms. Meikle was talking to Mr. Marchand about the Recognition Dinner, and assumed that Ms. Meikle was investigating the incident.  (Id. at 56, 59.)

I.      Mr. Marchand's Treatment of Ms. Seybert After Her Complaints to Ross Reucassel

1.      Ms. Seybert's December 2003 Performance Review

Ms. Seybert's next relevant interaction with Mr. Marchand occurred at her December 2003 performance review meeting.  (Ex. A, at 135.)  Mr. Marchand had given Ms. Seybert a "Below Expectations" rating, her first ever poor performance review.  (Ex. A, at 135-36.)  According to Ms. Seybert, this performance review contained false accusations about Seybert's performance and competence, and improperly held her accountable for results that were completely out of her control.  (Seybert at 135-36; Ex. 2, EEOC 000239-50.)  For example, Mr. Marchand gave Ms. Seybert a Below Expectations rating on an objective, and then explained the rating as follows:  "Project could not be completed due to MIS inability to handle process.  Susan not held responsible for this goal not being achieved."  (Ex. D, at 96-97; Ex. 2, EEOC 000241.)  Ms. Meikle confirmed that Mr. Marchand's Below Expectations rating in this context was inappropriate.  (Ex. D, at 97.)

During the meeting, Mr. Marchand could not give Ms. Seybert examples to support his negative ratings.  (Ex. A, at 136.)  Ms. Seybert became upset and told Mr. Marchand that there was no basis for what he had written.  (Id.)  Mr. Marchand replied with something to the effect of, "Don't talk to me like that – everything I have in here is true until you prove otherwise."  (Ex. 3, at 6; Ex. A, at 136.)  During the performance review meeting, Mr. Marchand also yelled at

-15-

Ms. Seybert (Ex. A, at 110-11.)  Ms. Seybert explains that she was so frustrated at the situation that she began to cry.  (Id. at 136.)

> 2.  Mr. Marchand Forces Ms. Seybert to Be Tested On Computer Skills

After receiving her poor performance review, Ms. Seybert set about trying to disprove the negative assessment.  She sent Mr. Marchand comments on the review and other proof of achievement of her goals.  (Ex. A, at 136;  Exhibit 2, EEOC 000239-50.)  Mr. Marchand responded that he could not accept her representations about her knowledge of IGI's order entry system unless she was tested.  (Ex. A, at 137-38.)  Accordingly, Ms. Seybert scheduled a computer test to prove her competency to Mr. Marchand.  (Id.)  Ms. Seybert passed the test, and Mr. Marchand ultimately changed his assessment of her on that issue.  (Id.)  Mr. Marchand also changed several of the other negative assessments, but he retained the "Below Expectations" overall rating.  (Id. at 138-39; Ex. 2, EEOC 000114-19.)  Mr. Marchand's review of Ms. Seybert's 2003 performance was finalized sometime between March and May of 2004.  (Ex. D, at 115.)

> 3.  Impact of Below Expectations Rating On Ms. Seybert's Compensation

Mr. Marchand's "Below Expectations" rating of Ms. Seybert for 2003 negatively impacted her compensation.  Ms. Seybert did not receive a raise for 2004, and received a lower bonus for 2003.  (Ex. D, at 187-89.)

> 4.  Mr. Marchand Restricts His Contact With Ms. Seybert

After the 2003 performance review was finalized, Mr. Marchand again stopped communicating with Ms. Seybert in the normal course of business, limiting his communications with her to e-mail or discussions in group meetings.  (Ex. A, at 107.)  Because Ms. Seybert could

not get in touch with him in person, she states that it became hard to effectively complete her job. (Ex. A, at 148; Ex. 9, at 40.)

          5.     Mr. Marchand Criticizes Ms. Seybert To Her Subordinates

      Mr. Marchand criticized Ms. Seybert to her subordinates on several occasions.  (Ex. 9, at 40.)  Ms. Seybert's colleague, Katherine Vance, testified about one particular occasion when Mr. Marchand was speaking with the customer service representatives about a procedure Ms. Seybert had suggested.  Mr. Marchand reportedly raised his voice to say:  "We're not doing that.  That's a stupid idea.  What the hell is she thinking?  Doesn't she have a clue?"  (Ex. 9, at 41.)  Ms. Vance communicated this to Ms. Seybert, as well as her assessment that Mr. Marchand's behavior was "totally inappropriate" and that he was undermining Ms. Seybert's authority.  (Ex. 9, at 42-43.)

          J.     May 2004 Meeting Regarding Customer Service Function and Cessation of Mr. Marchand's Role as Ms. Seybert's Supervisor

      In May 2004, Mr. Marchand met with Ken Reucassel and Ms. Meikle to discuss the Customer Service function.  Ms. Meikle's notes of the meeting reflect that Ms. Seybert's work performance was criticized during that meeting.  (Ex. 2, EEOC 000391; Ex. D, at 133.)  In June 2004, Mr. Marchand created a set of handwritten notes titled "IGI Supply Chain Organization Personnel Issues."  (Exhibit 2, EEOC 000392-99.)  In that document, Mr. Marchand again criticized Ms. Seybert, noting "[m]ust seriously consider position of Sue – is she what we need want . . . short of target in so many areas . . . probable [sic] best to start over with someone new."  (Ex. 2, EEOC 000395.)  Both Ken Reucassel and Ms. Meikle denied that Mr. Marchand had any problems with Ms. Seybert's performance during 2004 or that he recommended that she be replaced.  (Ex. B, at 64; Ex. D, at 117-19.)

K.     Ms. Seybert Learns that Mr. Marchand Will No Longer Be Her Supervisor

In 2004, Ms. Seybert was told by Mr. Marchand that he was looking for a job elsewhere. (Ex. A, at 162.) She also heard a rumor that he would be moved into a new position, which was considered the "kiss of death." (Id. at 163.) Mr. Marchand told Ms. Seybert that he would no longer be her supervisor. (Id. at 161.) After October 2004, Ms. Seybert had no further communication with him. (Id. at 169.)[9]

L.     Mr. Faoro is Hired to Replace Mr. Marchand

David Faoro replaced Mr. Marchand in early October 2004. (Id. at 169.) Ms. Seybert viewed Mr. Faoro's hiring as an opportunity for a "fresh start." (Id. at 190.) When Mr. Faoro was hired, Ken Reucassel told him that he was to make an assessment of his department, including personnel recommendations. (Ex. C, Deposition of David Faoro, at 20, 81.) Mr. Faoro's assessment included discussion of the anticipated acquisition of another company and an anticipated shift in the business from a specialty chemical business into a commodity-based business. (Id. at 68-69.)

M.     Mr. Faoro's Business Assessment, Awareness of Ms. Seybert's Complaint, Elimination of Seybert's Position, and Reason(s) for Ms. Seybert's Termination

1.     Mr. Faoro's Assessment Meeting With Ms. Seybert

On October 21, 2004, Mr. Faoro had an initial meeting with Ms. Seybert. (Ex. C, at 31-32; Ex. A, at 188.) During this meeting, Ms. Seybert told Mr. Faoro she had previously made a

---

[9] Mr. Marchand eventually left IGI because he had expressed an interest to take on more responsibility, and Ken Reucassel reportedly did not believe there was such a role available for Mr. Marchand at that time. (Ex. B, at 62.)

complaint about Mr. Marchand.  (Ex. A, at 188.)  The parties dispute the specificity of Ms.

Seybert's discussion with Mr. Faoro during this meeting.

Ms. Seybert wanted to tell Mr. Faoro "her side of the story" because she anticipated that

Mr. Faoro would examine Mr. Marchand's reviews of her performance.  (Ex. A, 189-90.)

Accordingly, in their first face-to-face meeting, Ms. Seybert told Mr. Faoro that she had made a

prior complaint about Mr. Marchand, but assured Mr. Faoro that she viewed his arrival as a

"fresh start."  (Id.)  Ms. Seybert believes she characterized her prior complaint as one of

harassment, but does not know if she characterized the complaint as one of *sexual* harassment.

(Id.)

Mr. Faoro testified, however, that Ms. Seybert made only a vague reference to her prior

problems with Mr. Marchand in that meeting.  (Ex. C, at 39-40.)  Mr. Faoro also testified that he

was not aware that Ms. Seybert had complained of harassment until *after* making the decision to

terminate her.  (Ex. C, at 30-31; see also Def.'s Mot. for Summ. J. at 2.)  However, Ms. Seybert

claims that her complaint to Mr. Faoro was more specific, and notes that Mr. Faoro made a

reference to it in his notes of their meeting with the phrase "past complaint with Brett."  (Pl.'s

Resp. to Def.'s Statement of Uncontested Facts at ¶ 56; Exhibit 2, EEOC 000191; Ex. D, at 42-

43.)

The next day, Mr. Faoro asked Ms. Meikle about Ms. Seybert's problems with Mr.

Marchand.  (Ex. C, at 43-44.)  Ms. Meikle thought about the question and stated that the only

thing she could think of was a dinner at which some comments were made which had been

inappropriate.  (Id. at 45-46.)  Based on his discussion with Ms. Meikle, Mr. Faoro assumed that

Mr. Marchand's comments at the Recognition Dinner were inappropriate in a sexual manner (Ex.

C, at 46.)  Ms. Meikle also said that the situation regarding these comments had been resolved, and did not "portray it . . . as a big deal."  (Id. at 45, 47.)  Mr. Faoro testified to his understanding that, if Ms. Seybert had raised an issue about sexually inappropriate comments at a work dinner, such action would be deemed a complaint under IGI's Respect in the Workplace Policy.  (Ex. D, at 149.)

> 2.      Ms. Seybert's Termination

In a discussion document dated November 2, 2004, less than two weeks after Mr. Faoro became aware of Ms. Seybert's prior complaint against Mr. Marchand, Mr. Faoro recommended that Ms. Seybert's employment be terminated.  (Ex. E; Exhibit 2, EEOC 000400-14.)  The parties dispute the facts surrounding the decision to terminate Ms. Seybert, including their respective views as to the real reasons for her termination.  These reasons depend in large part on whether Mr. Faoro actually intended to "eliminate" Ms. Seybert's position, as part of a business restructuring, or simply "replace" her with someone else.

> a.      IGI's Proffered Reason for Termination: Elimination of Ms.
>         Seybert's Position

According to IGI, Mr. Faoro concluded that the optimal structure for IGI was to have a manager of supply chain, as opposed to a manager of customer service like Ms. Seybert.  (Ex. C, at 70.)  A manager of supply chain would be responsible for transportation, transportation inventory, and related processes.  (Ex. C, at 69.)  Given IGI's focus on cost management and cost structure, Mr. Faoro was trying to "keep salaried dollars constant while finding the optimal organizational structure" for IGI.  (Ex. C, at 70.)  Accordingly, he decided that the best course of action was to eliminate Ms. Seybert's position, in order to create resources outside customer service.  (Ex. C, at 71, 75.)

Both Mr. Faoro and Ken Reucassel testified that Mr. Faoro always intended to eliminate Ms. Seybert's position, and that Mr. Faoro's November 2, 2004 discussion document contained language intended to convey that intent. (Ex. C, at 65; Ex. B, at 82.) According to IGI, this discussion document proposed eliminating Mr. Seybert's position as customer service manager and "replacing" that position with a customer service supervisor position based in Toronto. (Def.'s Statement of Uncontested Facts at ¶ 43; Ex. 2, EEOC 000407;(Ex. C, at 54, l. 14-19; Ex. E, EEOC 000407.)[10]

      b.    Ms. Seybert's Theory Regarding Retaliatory Termination

Ms. Seybert contends that she was terminated because of her complaints about Mr. Marchand, and not as part of an overall corporate restructuring. She notes that Mr. Faoro's discussion document recommends that IGI "replace" the current Customer Service Manager (and not eliminate that position), regardless of whether the anticipated corporate acquisition took place. (Exhibit 2, EEOC 000407, 410-11; Ex. E, EEOC 000407, 410-11.) This discussion document makes no mention of Mr. Faoro's supposed goals of reallocating salary resources and hiring a manager of supply chain. (Ex. 2, EEOC 000400-414; Ex. E.) Instead, Mr. Faoro's proposal focuses on Ms. Seybert personally, identifying, among other things, Mr. Seybert's alleged "[l]ack of leadership and focus on continuous improvement" and noting that "[c]urrent manager has lost the support of the organization" – statements that Ms. Seybert claims Mr. Faoro made in support of his decision to replace her. (Ex. 2, EEOC 000402; Ex. E, EEOC 000402.)

---

[10] The parties agree that Ken Reucassel's approval was needed to implement Mr. Faoro's recommendations, and he never approved the customer service supervisor position. (Ex. C, at 66.)

The discussion document explicitly states, "Replace Current CS Manager." (Exhibit 2, EEOC 000407; Exhibit E, EEOC 000407.)

Ms. Seybert also argues that IGI's rationale for her termination does not show up in written form until *after* IGI became aware of her allegations of discrimination on or about February 1, 2005. (Exhibit 2, EEOC 000164-168.) And although IGI eventually hired a manager of supply chain, there is no documentation that IGI considered doing so until approximately March 1, 2005, four months *after* Mr. Faoro decided to terminate Ms. Seybert's employment. (Ex. 1, D-1198.)

To lend more support to her theory that she was personally "replaced," rather than her position "eliminated," Ms. Seybert points to Ms. Meikle's testimony that Ms. Meikle viewed the recommendations of elimination and replacement as distinct from one another. (Ex. D, at 182-183.) Ms. Meikle also acknowledged that Mr. Faoro was considering the "replacement" of Ms. Seybert, as opposed to (or in addition to) the elimination of her position. (Id.)

The parties dispute whether any IGI employees other than Mr. Faoro questioned the need for a customer service manager position. IGI argues that certain other managers within IGI, including Heather Meikle, Ken Reucassel and Brett Marchand, questioned the need for a customer service manager. To support this contention, IGI points to certain handwritten meeting notes and testimony that suggest a possible alternative business structure for IGI. (Id. at 131-33.) Ms. Seybert counters that the handwritten notes were directed at her personally, rather than her position, insofar as they were prepared by 1) Ms. Meikle in reference to a meeting she had with Ken Reucassel and Mr. Marchand in which criticisms were made about Ms. Seybert's

-22-

performance, (Exhibit 2, EEOC 000391), and 2) by Mr. Marchand himself.  (Ex. 2, EEOC 00392-99).  None of these notes explicitly question the need for a customer service manager.

          c.       Mr. Faoro's Knowledge of Ms. Seybert's Complaints

IGI asserts that there is no evidence that Mr. Faoro was influenced by, or even aware of, the views of Mr. Marchand, Ms. Meikle or Ken Reucassel concerning the customer service manager position prior to making his own recommendation about it.  Def.'s Mot. for Summ. J. at 6.  Ms. Seybert counters that Mr. Faoro relied on input from Mr. Marchand in making the decision to terminate Ms. Seybert's employment, and was aware of her complaints concerning Mr. Marchand's harassment.  Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. at 18-20.

Ms. Seybert points out that Mr. Faoro admitted that he had seen Mr. Marchand's performance assessments of Ms. Seybert prior to his initial assessment meeting with Ms. Seybert on October 21, 2004. (Ex. C, at 34-35.)  Additionally, Mr. Faoro's own testimony about their initial assessment meeting suggests that he was aware as of October 22, 2004, that Ms. Seybert had filed an internal complaint of sexual harassment against Mr. Marchand.  (Ex. C, at 39-40, 42-43, 45-49.)  Ken Reucassel was also aware that she had complained about Mr. Marchand within days after the Recognition Dinner. (Ex. B., at 31-32, 51-54.)[11]

There are certain similarities between Mr. Faoro's November 2004 proposal and Mr. Marchand's June 2004 proposal.  Both recommended "replacing" Ms. Seybert, but keeping a Customer Service Manager in one location and adding a Customer Service supervisor in the

---

[11] Although the fact of Ken Reucassel's awareness is not in dispute, the source of the information is in dispute.  See Section I.H.3., supra.

other.  (Exhibit 2, EEOC 000400-414 and 000392-99.)  Both men identified Ms. Seybert as

having a lack of credibility within IGI.  (Id.)

    IGI admits that during Mr. Faoro's assessment period, Mr. Faoro had a two-hour meeting

with Mr. Marchand during which Ms. Seybert was discussed as one among approximately 20

employees. (Ex. C, at 35.)  Mr. Faoro asserts that there was little substantive discussion about

Ms. Seybert; he believed he was "there to form [his] own opinion" and "did not . . .go seeking

[Marchand's] opinions." (Ex. C, at 38.)  Ms. Seybert disputes this, pointing to evidence that Mr.

Faoro was influenced by Mr. Marchand's views, such as the similarities of their proposals for

tinkering with the customer service department.  (Ex. B, at 62.)  She also points to evidence that

the only reason Mr. Marchand was leaving the organization was because he was seeking a

promotional opportunity and there were none available for him at IGI at that time.  (Id.)  Given

the circumstances of Mr. Marchand's departure, Ms. Seybert argues, Mr. Faoro's "emphatic

distancing of himself from Marchand is odd and looks coached." Pl.'s Resp. to Def.'s Statement

of Facts at ¶ 46.

    3.    Ms. Seybert's Termination Meeting

    On January 12, 2005, Ms. Seybert met with Mr. Faoro to discuss her performance for

2004, and was told that her employment would be terminated effective that day.  (Ex. C, at 22;

Ex. D, p 71.)  Ms. Seybert was told that the reason for her termination was job elimination and

restructuring.  (Ex. C, at 23-24.)  Ms. Seybert was not provided advance notice of her

termination, as IGI had provided for several other employees in the Wayne office whose jobs

were "eliminated." (Ex. D. at 69-70.)  Ms. Seybert was not permitted to speak to her staff, and

was escorted from the office.  (Ex. A, at 201-02.)  Some time later, Ryan O'Kell was hired as

manager of supply chain.  (Ex. C, at 75.)

Because Ms. Seybert believed that she was meeting with Mr. Faoro to discuss her

performance review (rather than to be terminated), she had prepared her self-assessment for

2004, which included the following:

> Continue to maintain professionalism and meet and/or exceed the
> requirements of my position despite harassment by my manager
> during that timeframe.  Although my complaint was put in writing
> at the request of IGI's CEO in October [2003],[12] no follow-up or
> resolution was ever communicated by any member of Upper
> Management or Human Resources to date.

(Exhibit 2, EEOC 000358-360.)

N.     Administrative Filings

Ms. Seybert filed a Charge Questionnaire with the Equal Employment Opportunity

Commission ("EEOC") on February 24, 2005.  (Ex. F, EEOC Charge; Ex 2, EEOC 00073-77.)

When she filed the charge, Ms. Seybert explicitly requested that the EEOC cross-file it with the

Pennsylvania Human Relations Commission (PHRC), in both her cover letter to the EEOC's

intake supervisor as well as the form specifically designated for that purpose.  (Ex. G, EEOC

Cross Filing Request; Ex 2, EEOC 00073-77.)  On April 1, 2005, in anticipation of an intake

interview at the EEOC with Investigator Joyce Jones on April 11, 2005, Ms. Seybert submitted

additional documents outlining the nature of her allegations.  (Exhibit 2, EEOC 000122.)  Ms.

Seybert met with Ms. Jones for an intake interview on April 11, 2005, and submitted documents

---

[12] Ms. Seybert mistakenly identified October 2004 as the date of her complaint in the
self-assessment.  (Ex. A, at 206-07.)

in support of her claim at that time.  Ms. Seybert was unable to prepare, sign and file a formal

Charge of Discrimination that day – even though that was the intent of the meeting – because the

EEOC's computers were out of service.  (Exhibit 2, EEOC 00072.)  Subsequent to Ms. Seybert's

meeting with Ms. Jones, Ms. Jones was hit by a truck and killed while crossing the street outside

of the EEOC's offices.  (Id.)

Ms. Seybert submitted a fully executed and notarized Charge of Discrimination to the

EEOC on November 7, 2005.  (Exhibit 2, EEOC 00072.)  Ms. Seybert's Charge of

Discrimination here relates back to the filing of the Charge Questionnaire and was deemed filed

on February 25, 2005.  (Def.'s Statement of Uncontested Facts, ¶ 64.)  The EEOC transmitted

Ms. Seybert's formal Charge of Discrimination to the PHRC on December 28, 2005.  (Ex. 2,

EEOC 00059; Ex. H, Copy of EEOC Charge Time Stamped by PHRC.)  The EEOC did not

transmit a copy of Ms. Seybert's charge to the PHRC until more than 180 days after her

discharge.  Def.'s Statement of Undisputed Facts at ¶ 67.

III.     DISCUSSION

A.     Timeliness of PHRA Claim

The parties agree on the facts related to Ms. Seybert's filing of her EEOC and PHRA

Complaints.  They also agree that a claimant must file a complaint with the PHRC within 180

days after a defendant's alleged discriminatory act to preserve a claim under the PHRA.  Barb v.

Miles, Inc., 861 F. Supp. 356, 361 (W.D. Pa. 1994) (citing 43 P.S. § 959(a),(h)).  The parties

dispute, however, whether Ms. Seybert's filing with the EEOC within the 180-day period, and

her concurrent request that the EEOC cross-file her claim with the PHRC, was sufficient to

preserve her claim under the PHRA.  IGI recognizes that Ms. Seybert filed a Complaint with the

-26-

EEOC within 180 days of the discriminatory acts at issue, and requested that the EEOC cross-file with the PHRC pursuant to the agencies' work-sharing agreement. IGI contends, however, that the failure of the EEOC to actually transmit the Complaint to the PHRC before the expiration of the 180 day period makes Ms. Seybert's Complaint untimely under the PHRA, and therefore insufficient to preserve her PHRA claims. Ms. Seybert counters that her claim was deemed filed at the PHRC on the same date it was filed at the EEOC, and therefore was timely filed. In the alternative, Ms. Seybert asserts that equitable tolling principles apply to preserve her PHRA claims.

      1.      Timely Filing of PHRA Claim

The PHRC and the EEOC have entered into a Worksharing Agreement ("Worksharing Agreement"), which provides that "[i]n order to facilitate the assertion of employment rights, the EEOC and the [PHRC] each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially received the charges." Worksharing Agreement, Ex. 11, Section II.A. Courts within this Circuit have differed in their interpretations of the filing requirements of this Worksharing Agreement.

To bring a civil action under the PHRA, a claimant must first file an administrative complaint with the PHRC within 180 days of the alleged discriminatory action. 43 Pa. Stat. § 959(a),(h); Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d. Cir. 1997). Under Pennsylvania law, a charge of discrimination that has been forwarded by the EEOC to the PHRC pursuant to the Worksharing Agreement may be sufficient to satisfy the filing requirements of the PHRA. Lanz v. Hosp. of the Univ. of Pa., No. 96-2671, 1996 U.S. Dist. LEXIS 11154, *9 (E.D. Pa. July

30, 1996) (internal citations omitted).[13]  However, a claimant may not rely on the Worksharing Agreement to satisfy all of the requirements for relief under the PHRA.  Woodson, 109 F.3d at 927.

In Woodson, the Third Circuit Court of Appeals stated that a plaintiff who fails to file a timely complaint with the PHRC is precluded from judicial remedies under the PHRA.  Id. at 925, 927.  IGI relies on this decision for the propositions that Pennsylvania courts have strictly construed the PHRA's mandatory 180 day filing period, and a complaint must be actually received by the PHRC within 180 days of the alleged discriminatory act.  As Ms. Seybert points out, however, Woodson involved a situation in which the plaintiff filed a charge at the EEOC but *never sought* dual-filing with the PHRC, and so the EEOC never transmitted the discrimination charge to the PHRC.  Id. at 925.  On these facts, the court held that the plaintiff's PHRA was untimely, and the EEOC procedures could not preserve her PHRA claims.  The court did *not* hold that filing a complaint at the EEOC within 180 days, *along with a request that the EEOC dual-file* the complaint with the PHRC, would not satisfy the filing requirements of the PHRA.  Indeed, the court explicitly stated that the case would be "quite different" if the plaintiff had

_____

[13]  Pennsylvania provides an administrative remedy for employment discrimination claims, such that a claimant cannot file a charge with the EEOC unless that charge has first been filed with the PHRC and (1) 60 days have passed, or (2) the PHRC has "terminated" its proceedings.  Woodson, 109 F.3d at 926.  The Worksharing Agreement, however, allows the PHRC and the EEOC to effectively waive their right to initially review claims that are first filed with the other agency.  Id. at 925-26.  Under this Worksharing Agreement, a claim that is first-filed with the EEOC may be processed by the PHRC, as the PHRC has effectively waived its statutory right to initially process discrimination claims.  Id. at 926.  Accordingly, the Worksharing Agreement effectively "terminates" the PHRC proceedings where the complaint is filed first with the EEOC.  Zahavi v. PNC Fin Servs. Group, No. 07-376, 2007 U.S. Dist. LEXIS 77484, * 16-17, n.11 (W.D. Pa. 2007).

"marked the box for the EEOC to cross-file. . . ." Id. at 926 n.12.  Here, Ms. Seybert did make the cross-filing request.

In Barb v. Miles, Inc., discussed in both parties' briefs, the court considered the argument that the plaintiff failed to exhaust her administrative remedies under the PHRA because she did not directly file with the PHRC.  861 F. Supp at 361.  The court determined that the plaintiff *did* exhaust her administrative remedies under the PHRA by filing a charge of discrimination with the EEOC, which was then transmitted to the PHRC pursuant to the Worksharing Agreement. Id.  Although timeliness of filing was not at issue in Barb, the court stated in dicta that "plaintiff filed the complaint with the PHRC *on the date it received* a copy of plaintiff's EEOC charge." Id. (emphasis added).

Taken by itself, this statement might suggest that a complaint is not deemed filed with the PHRC until *the date it is actually transmitted* to the PHRC, irrespective of whether the claimant had previously filed the complaint with the EEOC and requested that the EEOC cross-file it with the PHRC.  However, this suggestion appears to be contradicted by a case that the Barb court relied upon, Lukus v. Westinghouse Elec. Corp., 419 A.2d 431 (Pa. Super. 1980).  Lukus makes clear that a claimant's filing of a charge of discrimination with the EEOC, which is then transmitted to the PHRC, satisfies all the pleading requirements of PHRA Section 959.  Id. at 452.

Like Barb, Lukus did not deal with the timeliness of filing, and therefore it is not clear whether the Lukus court would have found the PHRA pleading requirements to be satisfied if the discrimination charge were transmitted by the EEOC to the PHRC after the 180-day time period. The court in Lukus noted that "[t]he transmittal of Lukus's EEOC complaint to the PHRC

-29-

constituted a filing of a verified complaint with the PHRC. Nothing in the PHRA required that Lukus personally file her complaint with the PHRC, and her EEOC complaint satisfied all the pleading requirements prescribed by section 959." 419 A.2d at 452. Although the first half of this statement could be read to mean that the discrimination complaint was not deemed "filed" with the PHRC until it was actually transmitted by the EEOC, the second half of it implies that because plaintiff's "EEOC complaint satisfied all the pleading requirements [of the PHRA]," plaintiff's filing of the EEOC complaint preserved her right to proceed on her related PHRA claims, irrespective of when the complaint was actually transmitted to the PHRC.

On the other hand, citing Woodson and Barb, some district courts in this Circuit have required that a complaint actually be filed with, or transmitted to, the Pennsylvania Human Relations Commission within 180 days after a defendant's alleged discriminatory act in order to preserve a claim under the PHRA. For instance, in Cunningham v. Freedom Ford Sales, Inc., No. 06-205, 2007 U.S. Dist. LEXIS 60613 (W.D. Pa. Aug. 17, 2007), the EEOC did not transmit the plaintiff's discrimination charge to the PHRC until almost a month after the filing period, and the claimant sought to preserve her claims under the PHRA. The court held that the state law claim was untimely, even though the PHRC accepted the charge as timely filed, citing the dicta in Barb, as well as Woodson's recognition that Pennsylvania courts are been strict in their application of the 180 day charge filing requirement. Cunningham, 2007 U.S. Dist. LEXIS 60613, at **8–12.

Cunningham is distinguishable from this case, however, in that the plaintiff in Cunningham clearly indicated to the EEOC upon filing her charge with that agency that she did *not* want her charge dual-filed with the PHRC. Id. at *8. In contrast, Ms. Seybert *explicitly*

-30-

*requested* that the EEOC dual-file her charge with the PHRC, pursuant to the Worksharing

Agreement.

It is more problematic to distinguish <u>Zahavi v. PNC Fin Servs. Group</u>, No. 07-376, 2007

U.S. Dist. LEXIS 77484 (W.D. Pa. 2007).  In <u>Zahavi</u>, the plaintiff first filed his discrimination

claim with the EEOC, and requested that the EEOC cross-file it with the PHRC. <u>Id.</u> at *2.  The

EEOC did not actually transmit the complaint to the PHRC until after the 180 day period had

expired, and the court dismissed the PHRA claim as untimely. <u>Id.</u> at **2, 14.  Ms. Seybert

attempts to distinguish this case on the grounds that there was evidence to suggest that the

plaintiff in <u>Zahavi</u> fabricated an earlier filing with the EEOC in order to preserve her claims.

Plaintiff's Opp. at 44; <u>Zahavi</u>, 2007 U.S. Dist. LEXIS 77484 at *4, n.5.  However, this evidence

was not cited by the court in <u>Zahavi</u> as having contributed to its decision.

Other district courts have held that first-filing a discrimination complaint with *either* the

EEOC *or* the PHRC within the applicable mandatory filing period, together with a request to

dual-file, is sufficient to preserve claims under the second-filed statute.  For instance, in <u>Kumar</u>

<u>v. Renewal, Inc.</u>, No. 06-1279, 2007 U.S. Dist. LEXIS 24327 (W.D. Pa. Mar. 29, 2007), the

court noted that "plaintiff must still file his charge of discrimination within 180 days *with either*

*the EEOC or the PHRC* in order to preserve the state claims under the PHRA." <u>Id.</u> at *2

(emphasis added).  Although this statement was only dicta,[14] the court's use of "either/or"

_____

[14] The plaintiff had filed his initial complaint with the EEOC *outside* of the 180 day
limitations period, so the court granted the defendant's motion to dismiss.  <u>Kumar.</u> 2007 U.S.
Dist. LEXIS 24327 at **1–2.

language confirms that the plaintiff *could* have satisfied the statute of limitations by filing a charge at the EEOC within the PHRA's 180 day limitations period, as Ms. Seybert did here.

Presenting the reverse situation from this case, the plaintiff in Berkoski v. Ashland Reg'l Med. Ctr., 951 F. Supp 544 (M.D. Pa. 1997), first filed a complaint at the PHRC and sought to dual-file at the EEOC. Id. at 545. The initial filing took place at the PHRC 272 days after the alleged discriminatory act, and the PHRC did not actually transmit the complaint to the EEOC until after the 300 day deadline for federal claims had expired. Id. Denying the defendant's motion to dismiss, the court confirmed that the terms of the Worksharing Agreement "effectuated a filing of discrimination charges with the EEOC on the same date that he filed his complaint with the PHRC." Id. The court explicitly addressed the defendant's argument that the plaintiff's federal claims should be dismissed because the complaint was "never actually filed" with the EEOC until after the applicable deadline. The Berkoski court stated,

> Although such an argument has facial appeal, it is clear that Berkoski took the appropriate steps to file the document with the EEOC. He submitted a verified complaint with the PHRC with a statement that it was to be referred to the EEOC. The PHRC's failure cannot now bar Berkoski from pursuing his federal claims.

Id. at 548. Discussing the Worksharing Agreement, the court stated, "Berkoski correctly believed that filing his complaint with the PHRC coupled with a request for dual filing would be sufficient to also file with the EEOC," and noted that Berkoski's belief was consistent with governing regulations and case law from other circuits. Id. at 549. Although the situation in Berkoski was the reverse of the one here (first-filed with the PHRC rather than with the EEOC), there is nothing in the Worksharing Agreement or in the caselaw to suggest that complaints that are first-filed with the EEOC and sought to be dual-filed with the PHRC, should be treated

differently from those that are first-filed with the PHRC and sought to be dual-filed with the EEOC.[15]

The most reasoned conclusion here is that filing a charge of discrimination with the EEOC within the 180 mandatory filing period, together with a request that the EEOC dual-file it with the PHRC, is sufficient to preserve claims under the PHRA. As the courts in <u>Barb</u> and <u>Lukus</u> both recognized, nothing in the PHRA requires a claimant who had already filed at the EEOC to personally file a second formal complaint with the PHRC. <u>Barb</u>, 861 F. Supp. at 362 (citing <u>Lukus</u>, 419 A. 2d at 452). Yet, if this Court were to follow the path urge by IGI, that is exactly what a claimant would have to do, to ensure that her complaint was timely received by the PHRC. In effect, every discrimination claimant would have to file a charge of discrimination with *both* the EEOC *and* the PHRC, to ensure that it was received by both agencies by the 180 day deadline. The claimant would have to assume the entire risk of transmission delays between the EEOC and the PHRC, and the cross-filing procedure contemplated by the Worksharing Agreement would thus be rendered meaningless to the claimant. This cannot be what the legislature intended. Accordingly, summary judgment is denied as to Ms. Seybert's PHRA claims, on the ground that her complaint based upon discrimination was timely filed with the

---

[15] A recent Supreme Court decision reflects limited judicial flexibility in construing filing requirements, but the decision is narrow in scope and does not affect the analysis in this case. In <u>Federal Express Corp. v. Holowecki</u>, 128 S. Ct. 1147 (2008), the Court held that the plaintiff was not responsible for the EEOC's failure to convert an "intake questionnaire," which included all information required for a charge of discrimination, into a formal charge as a condition precedent to an Age Discrimination in Employment Act ("ADEA") claim. 128 S. Ct. at 1153. The Court also cautioned employees and their counsel to be careful not to apply the ADEA rules to other states without careful and critical examination. <u>Id.</u> IGI asserts that <u>Holowecki</u> has no application to the timely filing requirements of the PHRA, and Ms. Seybert does not argue to the contrary. <u>See</u> Oral Argument Tr. at 22, 26.

PHRA.  Alternatively, even if her discrimination complaint were not timely filed, Ms. Seybert

could pursue her PHRA claims on the principle of equitable tolling.[16]

---

[16]  Equitable tolling may be appropriate in three particular situations, although the list is not exclusive: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Zahavi, 2007 U.S. Dist. LEXIS at *17, n. 12 (internal quotation marks omitted) (declining to apply equitable tolling where plaintiff did not assert that the principle should apply, and none of the facts alleged in plaintiff's complaint suggested that the reasons for applying equitable tolling were implicated); see also Cunningham, 2007 U.S. Dist. LEXIS 60613, at **14-17.  Complainants are usually not held responsible for delays in filing caused by administrative agencies.  See Commonwealth Bank and Trust Co. N.A. v. Winterberger, 582 A.2d 730, 731-32 (Pa. Commw. Ct. 1990) (applying equitable tolling to allow plaintiff to pursue PHRA claims even though PHRC did not process plaintiff's complaint until after applicable filing period, where 1) plaintiff's counsel called the PHRC once a month for four months in order to be sure the claim was being processed, 2) plaintiff had attempted to file the complaint herself with the PHRC without relying on the Worksharing Agreement, and 3) the PHRC admitted to causing the administrative delays).  At the same time, plaintiffs must use due diligence in trying to timely file their claims.  Kocian v. Getty Ref. & Mktg. Co., 707 F.2d 748, 753-54 (3d. Cir. 1983).

Courts in this district have applied equitable tolling in cases similar to this one.  For instance, in Fosburg v. Lehigh Univ., No. 90-864, 1999 U.S. Dist. LEXIS 2833 (E.D.Pa. 1999), the court permitted the plaintiff to pursue his PHRA claims where the EEOC's transmittal of the discrimination charge was delayed past the 180 day mark.  The Court recognized that the plaintiff's initial filing was made with the EEOC within 180 days and the plaintiff expressly sought dual-filing with the PHRC, and held that the plaintiff's "justified reliance on the worksharing agreement equitably tolled the timing requirements of the PHRA."  Id. at **23-25; see also Carter v. Philadelphia Stock Exchange, No. 99-2455, 1999 U.S. Dist. LEXIS 13660 (E.D. Pa. 1999) (concluding that plaintiff's PHRA exhaustion requirement satisfied where EEOC filing was timely and plaintiff requested cross-filing).

Here, even if Ms. Seybert's discrimination complaint was not timely filed with the PHRC, the Court could apply equitable tolling to allow Ms. Seybert to pursue her PHRA claims.  Like the plaintiff in Fosburg, Ms. Seybert and her counsel justifiably relied on the Worksharing Agreement either to toll or to meet the filing requirements under the PHRA.  The application of equitable tolling is further supported by the unfortunate facts contributing to the delay in transmitting Ms. Seybert's complaint to the PHRC, namely the EEOC's computer problems on the day of Ms. Seybert's meeting with Ms. Joyce Jones, the intake investigator, as well as Ms. Jones' unfortunate and abrupt passing a short time thereafter.  (Ex. 2, EEOC 00072.)

B.     Sexual Harassment – Hostile Work Environment Claim

Under Title VII and the PHRA, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).  A hostile work environment based on sex is one form of unlawful sex discrimination.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).  Hostile work environment claims are identical under Title VII and the PHRA.  Weston v. Penna., 251 F. 3d 420, 426 (3d. Cir. 2003).  Five elements must be proved to bring a successful claim for sexual hostile work environment:  (1) the employee suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the employee; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.  Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006).

A plaintiff's hostile work environment claim will survive summary judgment if the plaintiff "presents sufficient evidence to give rise to an inference of discrimination by offering proof that her 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' . . . and the conduct is based on one of the categories protected under Title VII." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 279 (3d Cir. 2001) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also Weston, 251 F. 3d at 426. The Supreme Court has cautioned that a court must look at the totality of the circumstances when judging whether a work environment is hostile.  Harris, 510 U.S. at 23.  The Third Circuit Court of Appeals has stated that "courts should not consider each incident of harassment in isolation.

-35-

Rather, a court must evaluate the sum total of abuse over time." <u>Durham Life Ins. Co. v. Evans</u>,

166 F.3d 139, 155 (3d Cir. 1999) (internal citations omitted).  A court must evaluate the record

> as a whole to decide whether the plaintiff has proved his or her
> case, because "[p]articularly in the discrimination area, it is often
> difficult to determine the motivations of an action and any analysis
> is filled with pitfalls and ambiguities . . . . [A] discrimination
> analysis must concentrate not on individual incidents, but on the
> overall scenario."

<u>Cardenas v. Massey</u>, 269 F.3d 251, 261 (3d Cir. 2001) (quoting <u>Durham</u>, 166 F.3d at 149)

(alterations in original).

Title VII applies to both facially neutral mistreatment and overt discrimination, which in

sum constitute the hostile work environment.  <u>Cardenas</u>, 269 F.3d at 261 (discussing the

obligation of the courts to be "increasingly vigilant" against subtle forms of discrimination, and

the importance of allowing plaintiffs to prove discrimination indirectly).  As our Court of

Appeals has emphasized, "the advent of more sophisticated and subtle forms of discrimination

requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom,

including those concerning incidents of facially neutral mistreatment, in evaluating a hostile

work environment claim." <u>Id.</u> at 261-62.

    1.    "Because of" Gender

IGI contends that Mr. Marchand's treatment of Ms. Seybert, while not exemplary, was

not motivated by Ms. Seybert's gender and therefore cannot form the basis for her hostile work

environment claim.  Def.'s Mot. for Summ. J. at 8, 13.  "[V]erbal and physical harassment, no

matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by

the plaintiff's gender (or membership in other protected groups)."  <u>See also</u> <u>Ligore v. Hospital</u>

<u>Univ. of Penna.</u>, No. 04-5735, 2006 U.S. Dist. LEXIS 43996, at *23 (quoting <u>Koschoff v.</u>

Henderson, 109 F. Supp. 2d 332, 346 (E.D. Pa. 2000) (granting summary judgment to defendant on hostile work environment claim because evidence did not show that defendant's treatment of plaintiff was "because of" plaintiff's gender, where on a handful of occasions, plaintiff's same-sex co-worker made sexual comments to plaintiff, inquired about plaintiff's personal life and her daughter's sexual activities, slid her hand below plaintiff's bra strap, invited plaintiff to a gay bar, and elbowed and brushed up against plaintiff).

Ms. Seybert has alleged only three incidents that, on their face, contain overt sexual overtones: two occasions when Mr. Marchand stared at Ms. Seybert's breasts, and one occasion when Mr. Marchand directed a sexual comment to Ms. Seybert in front of Ms. Seybert's peers and superiors at the Recognition Dinner. However, when evaluating the "totality of the circumstances" concerning Ms. Seybert's hostile work environment claim, the court must consider other incidents that are, on the surface, non-discriminatory in character but still contribute to an overall sexually hostile environment. See Durham Life Ins., 166 F. 3d at 148 (finding that facially neutral mistreatment of plaintiff, plus overt sex discrimination, both sexual and non-sexual, together constituted a hostile work environment and defendant could not "disaggregate the various allegedly discriminatory acts and endeavors to cast doubt on each one" to argue that the non-sexual actions taken against the plaintiff had "innocent explanations"). "[The] words themselves are only relevant for what they reveal – the intent of the speaker." Aman v. Cort Furniture Rental Co., 85 F.3d 1074, 1083 (3d Cir. 1996) (reversing the district court's grant of summary judgment in favor of the employer for one of the plaintiff's harassment claims, and holding that acts of harassment, if motivated by sex or race, can constitute a hostile work environment regardless of their content). "A play cannot be understood on the basis of

some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990).

Ms. Seybert marshals various facts to show that Mr. Marchand's mistreatment of her was motivated by her gender. Pl.'s Resp. in Opp. To Def.'s Mot. for Summ. J. at 23–25. She notes that Mr. Marchand stared at her breasts, then ignored her after she complained; yelled at her for poor performance, lack of drive, and a memorandum, then gave her bad performance reviews after she complained; ignored her and belittled her to her subordinates after her complaints; and made an overtly sexual comment to her at the Recognition Dinner. Although not all of this mistreatment was overtly sexual, under the "totality of the circumstances," a jury could find that Ms. Seybert was mistreated and harassed "because of" her gender or sex. Cf. Koschoff, 109 F. Supp. 2d at 347 (where harassment of the plaintiff was not of a sexual nature, except for one isolated and relatively minor incident, and there was no other evidence that harassment was motivated by gender presented, no Title VII claim possible). Accordingly, the Court concludes that Ms. Seybert has presented sufficient evidence to support the first element of a hostile work environment claim based on sexual harassment – that the harassment be "because of" her gender or sex.

### 2.    Severe and Pervasive

Ms. Seybert has also presented sufficient evidence to support the second element of a hostile work environment claim – that the harassment was "severe and pervasive." Ms. Seybert has described a pattern of discriminatory behavior spanning several months, in which Mr. Marchand apparently singled her out for inappropriate sexual exchanges, insults, harsh rebukes,

-38-

humiliation, and an unfair performance review.  Viewing the evidence under "the totality of the

circumstances," a jury certainly could infer that Mr. Marchand was abusive toward toward Ms.

Seybert, and that Ms. Seybert's continued mistreatment at IGI constituted "discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of"

Ms Seybert's employment and "create an abusive working environment."  See Abramson, 260

F.3d at 279.[17]

      C.     Retaliatory Harassment

          1.     Prima Facie Case of Retaliation

Ms. Seybert also asserts that she was harassed by Mr. Marchand in retaliation for her

complaints.  Both Title VII and the PHRA contain anti-retaliation provisions.  Title VII forbids

an employer from "discriminat[ing] against" an employee or job applicant because he or she

"opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or

participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a); see Burlington

N. & Santa Fe Ry. v. White, 548 U.S. 53, 56 (2006).  To establish a prima facie case of

retaliatory harassment under Title VII, Ms. Seybert must show that (1) she engaged in protected

activity, (2) she was subject to "materially adverse" action against her, and (3) there was a causal

---

[17]  It is unclear whether IGI is challenging the remaining elements of a hostile work
environment claim.  Nonetheless, Ms. Seybert certainly presented sufficient evidence to support
these elements in the face of a summary judgment motion.  Ms. Seybert has presented evidence
that Mr. Marchand's behavior detrimentally affected her, and a jury could reasonably conclude
that this behavior would have detrimentally affected a reasonable person in like circumstances.
Also, a basis for employer liability is present here because Mr. Marchand was Ms. Seybert's
supervisor.  See Jensen, 435 F.3d at 452 ("If supervisors create the hostile environment, the
employer is strictly liable, though an affirmative defense may be available where there is no
tangible employment action") (internal citations omitted).

connection between her protected activity and the employer's action.  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006).  The PHRA contains equivalent prohibitions, and the analysis under both Title VII and the PHRA is the same.  See 43 Pa. Cons. Stat. § 955(d); Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006).

        2.      Protected Activity

A plaintiff may engage in protected activity, among other ways, by opposing unlawful discrimination.  Moore, 461 F.3d at 343.  "Opposition" can take the form of "informal protests" of discriminatory practices, including "making complaints to management."  Id. (internal citations omitted).  Internal complaints about sexually harassing behavior to a supervisor or other member of management may constitute protected activity.  See e.g. Alderfer v. Nibco Inc., No. 98-6654, 1999 U.S. Dist. LEXIS 16083, *2 (E.D. Pa. 1999) (finding that plaintiff had engaged in protected activity where she called the employer's human resources manager and complained that her supervisor had made "humiliating sexual comments" to or about her); see also Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135-36 (3d Cir. 2006) (protected speech can take the form of informal protests of discriminatory employment practices, including making complaints to management).

A plaintiff need not prove the merits of the underlying claim, but only that she had a good faith reasonable belief that the conduct was unlawful.  Wilkerson v. New Media Technology Charter School Inc. 522 F.3d 315, 322 (3d Cir. 2008).  However, general complaints of unfair treatment do not constitute "protected activity."  Slagle, 435 F.3d at 267-68.  To decide whether a plaintiff has engaged in "protected opposition conduct," the Court must "look to the message being conveyed rather than the means of conveyance."  Curay-Cramer, 450 F.3d at 135; see also

Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (holding that an employee's letter to an employer's human resources department was not protected activity because it did not specifically complain about age discrimination and it neither "explicitly or implicitly" alleged that a protected characteristic was the basis for the adverse employment action). In other words, not all complaints about sexual conduct will support a reasonable belief that such conduct is unlawful under Title VII. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (finding that no reasonable person could have believed that the isolated sexual comments at issue gave rise to an actionable hostile work environment claim).

Ms. Seybert's complaint to Mr. Marchand after the first time he stared at her breasts does not meet the standard for protected activity. Even read in the light most favorable to Ms. Seybert, the facts suggest that Ms. Seybert simply asked Mr. Marchand (albeit warily) whether her shirt was unbuttoned, whether there was something wrong, and why he was staring at her breasts. Viewed in the totality of the circumstances, this inquiry does not constitute "protected opposition conduct" to Mr. Marchand's staring, and a reasonable person would not believe that this one instance of staring gave rise to a Title VII claim. See Moore, 461 F.3d at 343; Curay-Cramer, 450 F.3d at 135.

By contrast, Ms. Seybert has presented a material issue of fact regarding whether her verbal complaint to Ken Reucassel in the spring of 2003 constituted protected activity. At the outset, Ms. Seybert has presented evidence that, at the time, she had a good faith and reasonable belief that her sexual harassment complaint was actionable. Her evidence tends to show that Mr. Marchand repeatedly directed sexual conduct at her - conduct that Ken Reucassel testified would violate IGI's Respect in the Workplace Policy. Also, Ken Reucassel told Ms. Seybert that he

would "talk to" Mr. Marchand about her complaint. Under the circumstances, this comment could suggest to Ms. Seybert that the situation was serious, and that Mr. Marchand might have violated applicable laws as well as IGI policies.

Moreover, Ms. Seybert's verbal complaint to Ken Reucassel was more than just a general complaint of unfair treatment – she specifically mentioned the occasions when Mr. Marchand stared at her breasts, in addition to his "walking the streets" comment, and requested to report to someone other than Mr. Marchand because she was uncomfortable working with him. Taken together, this evidence certainly could support a jury finding that Ms. Seybert engaged in protected activity when she made a verbal complaint to Ken Reucassel in the spring of 2003.

Ms. Seybert's complaint to Ross Reucassel is even stronger evidence of protected activity. At the outset, Ross Reucassel's request that Ms. Seybert put her oral complaint in writing supports Ms. Seybert's good faith belief that Mr. Marchand's behavior was unlawful, by suggesting that Ross Reucassel wanted to document her complaint for legal or other official purposes. According to the evidence presented by Ms. Seybert, by the time that she made the written complaint to Ross Reucassel, there had already been two occasions of Mr. Marchand staring at her breasts, much yelling, berating and belittling by Mr. Marchand, and Mr. Marchand's "you'll be walking the streets" comment. Taken together, these facts support Ms. Seybert's reasonable good faith belief that she had a hostile work environment and/or retaliatory harassment claim.[18]

_____

[18] There is also evidence that Ms. Seybert telephoned Ken Reucassel to complain about Mr. Marchand's sexual comment at the Recognition Dinner, that Ken Reucassel understood that the comment had sexual overtones, and that Ken Reucassel discussed the comment with the Human Resources Director. Although Ms. Seybert personally denies that she made such a call to

(continued...)

Moreover, Ms. Seybert's written complaint specifically references the two occasions when Mr. Marchand stared at Ms. Seybert's breasts, as well as the sexually explicit remark that Mr. Marchand made at the Recognition Dinner. Even though Ms. Seybert did not use the phrases "sexual harassment" or "Title VII retaliation" in her written complaint – or her earlier verbal complaint, for that matter - the sexual nature of the conduct described in Ms. Seybert's complaints, as well as the overall context in which the complaints were made, fairly communicated that the complaints were rooted in claims of sexually discrimination and retaliatory harassment. In light of all the circumstances, a jury could find that one or more of Ms. Seybert's complaints went beyond vague allegations of unfair treatment to inform IGI of their basis in a characteristic, i.e. gender, protected by Title VII, and therefore constituted protected conduct.

      3.    Adverse Employment Action

For purposes of determining whether an employment action is "materially adverse," it is "important to separate significant from trivial harms," because "Title VII . . . does not set forth 'a

_____

(continued...)

Ken Reucassel, these facts, construed in the light most favorable to her, also support a finding that Ms. Seybert opposed conduct that she reasonably thought unlawful under Title VII.

      IGI relies heavily on <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 271 (2001), in an attempt to show that Ms. Seybert did not have a reasonable belief that she had an actionable sexual harassment claim. However, <u>Breeden</u> involved a one-time, isolated sexual comment that was not directed at the plaintiff. By contrast, the evidence here suggests that Mr. Marchand repeatedly directed sexual conduct at Ms. Seybert herself, and treated her badly on several occasions. Viewed under the totality of the circumstances and in the light most favorable to Ms. Seybert, the evidence could support a reasonable, good faith belief that she had an actionable claim of sexual harassment.

-43-

general civility code for the American workplace.'" Burlington, 548 U.S. at 68 (quoting Oncale

v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  An employment action is

"materially adverse" when "it well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination." Burlington, 548 U.S. at 68 (citations and internal

quotation marks omitted); Moore, 461 F.3d at 341. "[P]etty slights, minor annoyances, and

simple lack of good manners" normally are not sufficient to deter a reasonable person.

Burlington, 548 U.S. at 68.  Whether an action is materially adverse will often depend "on a

constellation of surrounding circumstances, expectations, and relationships which are not fully

captured by a simple recitation of the words used or the physical acts performed." Id. at 69

(quoting Oncale, 523 U.S. at 81-82).  Interpreting Burlington, the Third Circuit Court of Appeals

has held that retaliatory harassment may constitute a "materially adverse" action for retaliation

claims.  See Moore, 461 F.3d at 341.[19]

_____

[19] The parties disagree as to the effect of Burlington on the standard in the Third Circuit
for retaliatory harassment claims, specifically regarding whether harassment needs to be "severe
and pervasive" in order to be a form of adverse employment action for purposes of a retaliation
claim.  Compare Pl.'s Rep. in Opp. to Def.'s Mot. for Summ. J. at 29, n.7 with Def.'s Mem. in
Supp. of its Mot. for Summ. J. at 15.  Before Burlington was decided, courts in this Circuit
"required those claiming unlawful retaliation under Title VII - like those claiming discrimination
made unlawful by that provision - to show an adverse employment action that alters the
employee's compensation, terms, conditions, or privileges of employment, deprives him or her of
employment opportunities, or adversely affects his or her status as an employee." Moore, 461
F.3d at 341 (internal citations omitted).  "Employees claiming retaliation by workplace
harassment, therefore, were required to show retaliatory harassment that was 'severe or pervasive
enough to create a hostile work environment' that would violate the anti-discrimination provision
of Title VII in order to violate Title VII's protection from retaliation." Id.
        As the Third Circuit Court of Appeals has noted, the Supreme Court in Burlington
"disagreed" with this formulation, and determined that the discrimination and retaliation
provisions of Title VII have different statutory language and different purposes, and,
accordingly, "the anti-retaliation provision, unlike the substantive provision, is not limited to
discriminatory actions that affect the terms and conditions of employment." Moore, 461 F.3d at
(continued...)

-44-

The many instances and manifestations of arguable mistreatment in this case are sufficient to meet the "materially adverse" element of a retaliatory harassment claim. A reasonable jury could find that the following actions of Mr. Marchand, taken together in context, constituted "materially adverse" action: yelling at and berating Ms. Seybert during a luncheon meeting, screaming at her on the telephone because of a memorandum she wrote about the retention of an employee, making a sexual comment at the Recognition Dinner, giving Ms. Seybert a poor performance review that affected her compensation, testing Ms. Seybert's computer skills, restricting contact with Ms. Seybert such that it interfered with her job, and speaking about Ms. Seybert to her subordinates.

        4.     Causal Connection

With respect to the causation prong of a retaliatory harassment claim, the standard in the Third Circuit is whether a reasonable jury could link the employer's conduct to retaliatory

---

(continued...)

341 (quoting Burlington, 548 U.S. at 64). Without explicitly addressing whether harassment needs to be "severe and pervasive" in order to be a form of adverse employment action for purposes of a retaliation claim, the Court in Burlington simply held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moore, 461 F.3d at 341 (quoting Burlington, 548 U.S. at 77).

     After Burlington, it appears that there is no longer a "severe or pervasive" requirement in the Third Circuit for retaliatory harassment claims. See generally Moore, 461 F.3d 331 (reversing the district court's grant of summary judgment because the plaintiff officers raised genuine issues of material fact regarding whether their supervisors violated Title VII by engaging in retaliatory harassment). See also Hare v. Potter, 220 Fed. App'x. 120, 131-32 (3d Cir. 2007); Hanni v. State of New Jersey Dept. of Environmental Protection, 205 Fed. App'x. 71, 80 (3d Cir. 2006). At oral argument in this case, defense counsel appeared to agree that harassment need not be "severe or pervasive" in order to form the basis for a retaliation claim. See Oral Argument Tr. at 12, 19-20.

animus.  See Jensen, 435 F.3d at 449 n.2 (explaining that "[t]he ultimate question in any retaliation case is an intent to retaliate vel non").  In assessing this, courts generally focus on two factors: (1) the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and (2) "the existence of a pattern of antagonism in the intervening period."  Id. at 450 (quotations and citations omitted).  However, "each case must be considered with a careful eye to the specific facts and circumstances encountered."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n.5 (3d Cir. 2000)); see also Burlington, 548 U.S. at 69.

Temporal proximity alone may be sufficient to establish the causal connection required for the prima facie case, or may be considered along with other factors in establishing the requisite causal connection.  Shellenberger v. Summit Bancorp Inc., 318 F.3d 183, 189 (3d Cir. 2003).  "[W]hen only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision, such temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn."  Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (holding that three-month period between protected activity and adverse action raises inference of retaliation).  Cf. Washco v. Federal Express Corp., 402 F. Supp. 2d 547, 559-60 (E.D. Pa. 2005) (dismissing plaintiff's retaliation claim where five months passed between the protected activity and adverse action); Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 415 (E.D. Pa. 2000) (no causation where six months passed between speech and adverse action).  See also Little v. United Technologies, 103 F.3d 956 (11th Cir. 1997) (holding that plaintiff did not reasonably believe that a single racial comment by one co-worker to another was unlawful discrimination because the plaintiff did not complaint about the comment until eight months after

-46-

the comment was made).

The temporal proximity between Ms. Seybert's instances of protected conduct and Mr. Marchand's harassment, while not particularly strong, could establish a reasonable inference that Mr. Marchand's harassment was motivated by a retaliatory intent. Mr. Marchand's yelling at Ms. Seybert for poor performance and "lack of drive" occurred in summer 2003, just a few months after her complaints to Ken Reucassel. Near the end of September 2003, Mr. Marchand again screamed at Ms. Seybert for her memorandum on Ms. Baumgard's retention, and a few days later he upset Ms. Seybert with a sexual comment at the Recognition Dinner. Mr. Marchand's performance rating of Ms. Seybert was communicated to her in December 2003, just a little over two months from Ms. Seybert's written complaint about the sexual comment made at the Recognition Dinner, as well as the alleged discussion between Ken Reucassel, Ms. Meikle and Mr. Marchand about the sexual comment.

For Ms. Seybert to show a causal connection between Title VII protected conduct and an adverse employment action, she must be able to show that the relevant actors at IGI had knowledge of her protected conduct. Iver v. Everson, 382 F Supp. 2d 749, 758 (E.D. Pa. 2005).[20] The evidence suggests that Ken Reucassel spoke to Mr. Marchand concerning Ms. Seybert's initial complaint about Mr. Marchand's staring at her breasts. It also suggests that both Ken Reucassel and Ms. Meilke talked to Mr. Marchand about Ms. Seybert's complaint concerning the sexual comment at the Recognition Dinner. Taken together, the evidence is

---

[20] The Third Circuit Court of Appeals has expressly recognized the requirement of knowledge by the decision-maker in First Amendment retaliation cases. Ambrose v. Township of Robinson, 303 F.3d 488, 493 (3d Cir. 2002).

sufficient to support a causal link between Ms. Seybert's protected conduct and Mr. Marchand's harassment.

     5.     Legitimate, Non-Discriminatory Reason

     After Ms. Seybert establishes a prima facie case, the burden shifts to IGI to proffer a legitimate, non-discriminatory reason for Mr. Marchand's treatment of Ms. Seybert. <u>Moore</u>, 461 F.3d at 342. The employer's burden to rebut the presumption of discrimination is "one of production, not persuasion; it 'can involve no credibility assessment.'" <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993)). Thus, the employer can satisfy its burden by presenting evidence sufficient to conclude that there was a nondiscriminatory reason for the plaintiff's discharge. <u>Fuentes</u>, 32 F.3d at 763 (citing <u>Hicks</u>, 509 U.S. at 508). The Third Circuit Court of Appeals has described this burden as "relatively light," as the defendant need not prove that its tendered reason actually motivated its decision. <u>Fuentes</u>, 32 F.3d at 763 (citing <u>Burdine</u>, 450 U.S. at 253).

     Here, IGI has satisfied its burden, explaining that Mr. Marchand's treatment of her was "arguably bad management," that came about "in response to gender neutral provocations by her" such as the memorandum on the retention of Ms. Baumgard. Def.'s Mot. for Summ. J. at 13. IGI also states that Mr. Marchand's conduct was "due to gender neutral causes that were initiated by [Ms. Seybert's] own unwise manner of dealing with her supervisor" such as Ms. Seybert's comment that she did not respect Mr. Marchand the same way that she respected Ken Reucassel. Def.'s Mot. for Summ. J. at 13-14. Given its "relatively light" burden, the Court finds that IGI has met that challenge for immediate purposes.

6.      Pretext

Once the employer has met its burden of production and advanced legitimate, non-retaliatory reasons for its conduct, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore, 461 F.3d at 342 (internal citations omitted). Stated differently, to obtain summary judgment on a retaliation claim, the employer must show that as a matter of law, the trier of fact could not conclude that (1) retaliatory animus played a role in the employer's decision making process, and (2) that it had a "determinative" effect on the outcome of that process. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Ms. Seybert's evidence of retaliatory animus is not overwhelmingly strong, but neither are the supposedly non-retaliatory reasons offered by IGI for Mr. Marchand's treatment of Ms. Seybert. On balance, Ms. Seybert has proffered evidence sufficient to convince a factfinder that IGI's non-retaliatory reasons for Mr. Marchand's harassment are pretextual, and that his mistreatment of Ms. Seybert was motivated by retaliatory animus, which animus had a "determinative effect." After the full presentation of the evidence at trial, a factfinder might very well decide against Ms. Seybert. Nevertheless, Ms. Seybert has raised a genuine issue of material fact as to retaliatory motives behind Mr. Marchand's harassment of her.

D.      Retaliatory Discharge

The framework for evaluating Ms. Seybert's retaliatory discharge claim is the same as the framework for her retaliatory harassment claim. For the reasons discussed above, Ms. Seybert has presented sufficient evidence to show that she engaged in protected conduct, and IGI does not dispute that her discharge is a "materially adverse" action. To satisfy the third element of a

-49-

prima facie case of retaliatory discharge, Ms. Seybert must proffer sufficient evidence to support a causal connection between her own protected conduct and IGI's decision to terminate her employment.

Under the caselaw discussed above, there is sufficient evidence to support a reasonable inference that, prior to Ms. Seybert's termination, Mr. Faoro was aware that Ms. Seybert had engaged in protected activity by making complaints based on her good faith belief that Mr. Marchand had violated Title VII. For instance, at Mr. Faoro's first meeting with Ms. Seybert, he learned about a past complaint that Ms. Seybert had made against Mr. Marchand. The next day, Mr. Faoro discussed that complaint with Ms. Meikle, and confirmed that it involved a sexual comment made by Mr. Marchand that was sufficiently serious to violate IGI's Respect in the Workplace policy.

Also, the evidence suggests that Mr. Faoro criticized Ms. Seybert's performance in much the same manner as Mr. Marchand, and held the same opinion as Mr. Marchand that IGI should consider replacing Ms. Seybert as customer service manager and creating a customer service supervisor position. IGI argues that this similarity might just be a coincidence, or an indication that like-minded individuals analyzed a workplace situation in a like manner. However, viewed in the light most favorable to Ms. Seybert, as the Court must at this junction, the evidence suggests that Mr. Faoro and Mr. Marchand discussed their desire to get rid of Ms. Seybert, and Mr. Faoro was influenced by Mr. Marchand's opinions and unlawful motives regarding Ms. Seybert. Indeed, Mr. Faoro's decision to terminate Ms. Seybert was not actually made until after he read the performance assessment drafted by Mr. Marchand.

There is also a close temporal proximity between the time Mr. Faoro first learned of Ms.

Seybert's protected conduct and his decision to recommend her termination.  Mr. Faoro's

recommendation to terminate Ms. Seybert came less than two weeks after his initial meeting

with Ms. Seybert, when he first learned of her complaint about his predecessor.  This period of

time, without more, is not sufficient to establish a causal connection between Ms. Seybert's

protected conduct and her termination.[21]  However, it certainly contributes to a finding of causal

connection, and a jury could reasonably infer that IGI's decision makers were directly or

indirectly motivated by retaliatory animus, which was a determining factor in Ms. Seybert's

termination.

IGI has asserted a legitimate, non-retaliatory reason for Ms. Seybert's termination: her

position was eliminated as part of a business reorganization to reallocate resources for a manager

of supply chain.  On its face, this proffered reason is strong, and is supported by IGI's decision to

hire a manager of supply chain after Ms. Seybert was terminated.

With IGI having met its burden of production by asserting a legitimate reason for Ms.

Seybert's termination, Ms. Seybert is left to present evidence that such reason was pretextual and

a factfinder could conclude that (1) retaliatory animus played a role in the employer's decision

making process, and (2) it had a determinative effect on the outcome of that process.  Krouse,

126 F.3d at 500-01.  Ms. Seybert has done this.

Viewed in the light most favorable to Ms. Seybert, the evidence suggests that Mr. Faoro

and other IGI personnel did *not* terminate Ms. Seybert just because her position was being

---

[21] Indeed, at oral argument, counsel for Ms. Seybert specifically noted that she was *not* suggesting that temporal proximity, standing alone, was sufficient to establish a causal connection in this case.  See Oral Argument Tr. at 34-35.

eliminated.  Rather, the evidence can support a conclusion that they had intended to terminate Ms. Seybert *whether or not* her position was eliminated.  Mr. Faoro's discussion document may be read as criticizing Ms. Seybert herself, rather than the overall usefulness of Ms. Seybert's position.  Although it appears that Mr. Faoro and other IGI personnel considered multiple business structures and employee allocations before terminating Ms. Seybert, there are no documents to confirm that IGI considered hiring a manager of supply chain until four months after Mr. Faoro decided to terminate Ms. Seybert's employment. Under the totality of the circumstances, a factfinder could determine that IGI's "reorganization" and supposed intent to hire a manager of supply chain was not the real motivation behind Ms. Seybert's termination – it was only pretext.   This evidence of pretext is bolstered by conflicting evidence regarding the discussions that took place between Ken Reucassel and Ross Reucassel concerning IGI's knowledge and handling of Ms. Seybert's complaints.

On balance, there is sufficient evidence for a factfinder to conclude that IGI's non-retaliatory reasons for Ms. Seybert's termination were only pretextual, and that her termination was influenced by retaliatory animus, which animus had a "determinative effect" on the decision to terminate Ms. Seybert.  While a jury may ultimately find that no retaliation occurred, when the facts are viewed in a light most favorable to Ms. Seybert, they can show that IGI, through Mr. Marchand, Mr. Faoro, Ross Reucassel, Ken Reucassel, and/or others, learned of Ms. Seybert's protected conduct and then reacted by engineering the process that resulted in her termination.

IV.    CONCLUSION

For the reasons discussed above, the Court denies summary judgment on all of Ms. Seybert's claims under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human

Relations Act.  An Order consistent with this Memorandum follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SUSAN J. SEYBERT, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE INTERNATIONAL GROUP, INC., | : | |
| Defendant. | : | NO. 07-3333 |

## ORDER

AND NOW, this 17th day of March, 2009, upon consideration of Defendant's Motion for Summary Judgment (Docket No. 14) and Plaintiff's Response in Opposition thereto (Docket No. 18), and after considering the presentations made at an oral argument on these issues, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge